BRANDON J. HARRISON, Judge
In August 2018, the Washington County Circuit Court terminated Misty Clark's parental rights to two of her children: J.S. and A.S. It found that the Arkansas Department of Human Services (DHS) had proved by clear and convincing evidence that the termination was in the children's best interest. In doing so, the circuit court expressly stated that the permanent-placement option that would best serve the children would be for their foster parents in Arkansas to adopt them. But wait-the children's grandparents had already completed the process of approval under the Interstate Compact on the Placement of Children (ICPC) and unequivocally expressed the desire to care for the children. And both the DHS case supervisor and the children's Court Appointed Special Advocate (CASA) volunteer had each recommended that the permanent placement be with the children's grandparents in Indiana. The circuit court, however, rejected the grandparents' request to have the children placed with them on a permanent basis. We hold that the court's stated reasons for rejecting the grandparents as a permanent placement for the children are clearly erroneous. We therefore reverse the termination order and remand for further proceedings consistent with this opinion.
I. Background
On appeal, Clark concedes that DHS proved the statutory grounds for terminating her rights. Clark is therefore deemed an unfit parent in the law's eyes.[1] That legal determination is important because the children have no fit parent to take them, which in turn means the State has the final authority to determine where to place the children.
How a circuit court exercises the power given to it by the State to place children of unfit parents in permanent *580 homes is far-reaching but not limitless. The State has an interest in finding a child an alternative permanent home when a parent cannot adequately provide one. Ark. Code Ann. §§ 9-27-341(c)(3), -360 (Supp. 2017). And displaced children have a concurrent interest in preserving relationships that serve their welfare and protection. Santosky v. Kramer , 455 U.S. 745, 759, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982). Our General Assembly recognizes this interest and has passed laws that promote the safety, permanency, and well-being of children in foster care. See, e.g. , Ark. Code Ann. § 9-28-1003 (Supp. 2017). More to the point for this case is that the General Assembly has enacted the policy that relatives are preferred when placing children in permanent homes. See Ark. Code Ann. §§ 9-28-105, -108 (Repl. 2016). This appeal tests whether that policy has real meaning.
A. The Permanency-Planning Order
A.S. and J.S. were eleven and twelve years old, respectively, when the termination hearing was convened. Seven-year-old sibling K.C. had lived with J.S. and A.S. in a family unit before the three siblings were removed from their mother's custody. After the removal, the court placed K.C. with his father, Brian Clark. J.S. and A.S. remained in foster care for the duration of the case. The foster parents had an agreement with Brian Clark to babysit K.C., so the siblings saw each other frequently. Another sibling, A.W., lives in Texas. Before J.S. and A.S. were placed with a Northwest Arkansas foster family, the children had frequent phone conversations with A.W. All four children have a relationship with their grandparents, the Sargents, who live in Indiana. James and Bari Sargent have been married for thirty-one years. Together they have seven children. Misty Clark is James's biological daughter. Bari is Clark's stepmother.
Clark's main argument on appeal is that the circuit court erred when it concluded that terminating her parental rights was in the children's best interest. An adoption by the foster parents, she argues, severs all familial bonds; yet the circuit court could have preserved those bonds by placing permanent custody of J.S. and A.S. with the Sargents.
DHS and the children's attorney ad litem (collectively DHS) disagree. (It is an abrupt about face for DHS because it took the opposite position in the circuit court.) They first argue that Clark is procedurally barred from arguing that termination was not in the children's best interest because they had grandparents willing and able to take the children. They press this procedural point because Clark did not appeal the circuit court's permanency-planning order. DHS also argues that terminating Clark's parental rights does not prevent the grandparents from petitioning to adopt the children or bar them from receiving preferential consideration in an adoption proceeding. DHS also states that the issue of "alternative placement was irrelevant to the termination hearing." See Andrews v. Ark. Dep't of Human Servs. , 2012 Ark. App. 22, at 10, 388 S.W.3d 63, 68.
We first address the waiver point. A permanency-planning order that is a final custody order is an appealable order. But this case does not have that type of planning order, which means that pursuant to Arkansas Supreme Court Rule 6-9(a)(1)(B), Clark would have had to procure a certification pursuant to Arkansas Rule of Civil Procedure 54(b) to appeal the permanency-planning order in this case. See West v. Ark. Dep't of Human Servs. , 373 Ark. 100, 281 S.W.3d 733 (2008). The clear implication is that a permanency-planning order of the typical variety is an interlocutory order that does not have to be appealed when it issues. If it had to be appealed when issued, then there would be no need to invoke Rule 54(b). Moreover, in *581 the permanency-planning order before us, the circuit court itself wrote, "The goal established in the case was reunification. The concurrent goal was custody and adoption." Consequently, there was no pressing need for Clark to appeal the interlocutory permanency-planning order because, at the time, a concrete plan (and some hope) was in place to reunite Clark with the children. In other words, there were two permanency paths going into the termination hearing, and one path on the table was a preferred option from Clark's point of view. Adoption by the foster parents did not become the clear choice until the termination hearing was convened. During the hearing, DHS recommended that the children be placed with Clark's parents in Indiana. That is what Clark herself wanted if the children were not going to be returned to her. There was therefore no technical or practical legal reason to have pursued an appeal before Clark's preferred permanency-placement option was foreclosed by a judicial determination. We therefore conclude that Clark is not procedurally barred from arguing that termination was not in the children's best interest because an alternative and satisfactory relative placement was available for the circuit court to consider when it ordered the termination. See Ellis v. Ark. Dep't of Human Servs. , 2016 Ark. 441, 505 S.W.3d 678.
B. The Circuit Court's Decision
The circuit court expressly considered, and rejected, relative placement as it proceeded to termination. Paragraph 8 of the termination order that Clark appeals states:
The Court declines to place the children with their grandparents, James and Bari Sargent in Indiana because the grandmother testified that they never wanted to get involved in the previous foster care cases involving the children because they did not want to get involved in the "ugly." The Court finds that despite having the financial means to attend court hearings, but never came to any of the prior hearings in this case. The Court notes that the preference is always placement with relatives, but only when it is in the best interests of the children. The testimony of Brian Clark is that [K.C.] is sad to leave visits with his siblings and the children's therapist testified that to sever the bond between [J.S., A.S., and K.C.] would be very detrimental to the children's mental health.
Moreover, the therapist also testified that the children have anxiety and anger issues, and suffer from adjustment disorder. The Court finds that their adjustment disorder can be attributed to the fact that the children have been in foster care three different times. By remaining in their current placement, the children can remain in their same counseling and schools. Most importantly [J.S. and A.S.] will be able to maintain contact with their sibling [K.C.] Given these factors, the court finds that it is in the best interests for [J.S. and A.S.] to be adopted by their current foster family.
The circuit court's oral ruling (with our emphasis) informs the written order and its decision.
The next question comes now whether or not it's in the children's best interest, [J.S.] and [A.S.], to be placed with their grandparents, maternal grandparents, [A.S.]'s grandparents and [J.S.]'s grandparents, Bari and James Sargent of Kokomo, Indiana. Having terminated mom's rights to the children, that terminates the grandparents' rights to [A.S.] and [J.S.] With respect to placement, we have an approved relative home study authorizing placement with Bari and James Sargent who are retired. They live in Kokomo, Indiana. Their home is *582 clean and safe. They have plenty of financial resources to meet the needs of the children. They are retired. They have $ 2,000 of expendable income left over at the end of the month. They testified that they have family in the Kokomo area or in Indiana. Mom testified that she believes that the children need to be placed with grandparents because they are relatives and the grandparents can meet all of the children's needs. Grandparents testified that they were aware the first time the kids came in foster care in Arizona. Then they went back to parents. Then they didn't think there was an issue. Then the kids went back to foster care the second time, and after that mom moved to Indiana. And then when grandmom was asked, "Well, what did you do when things got rough again?", she said, "Well, there wasn't anything to do to get them out of the ugly," the children out of the ugly. Well, the children have been in a lot of ugly over their short lives. Three times in foster care. Then grandpa testified that he's called DHS 32 times, and I have no doubt in my mind that grandpa and grandmom did that, calling, trying to talk to DHS to get them to do something.
But the thing that I don't understand is for two grandparents that have high IQs, they have the financial wherewithal to be able to drive here and be present at any hearing, they didn't do it. And it is not [sic] we haven't ever been through this before. The kids and the family have been through this three times before. And so I can't just say ok, you got a valid, approved ICPC, boom, you get the kids. We always prefer relatives if it's in the best interest of the children. If we send the kids to Indiana, they sever their ties of getting to see their brother, [K.C.], who is the one consistent family member they've had. He lives here. The therapist testified that she knows all three children and to sever that bond where [K.C.] doesn't get to see his brother and sister frequently and [J.S.] and [A.S.] don't get to see [K.C.] consistently would be harmful to all three children's mental health. They already have adjustment disorder. They already have anxiety. They were scared to death when mom wrecked into the ditch. Here they go to foster care the third time. And now [A.S.] and [J.S.] don't want to be put in the position of choosing. They don't need to choose. That's my job based upon the evidence and what's in the children's best interest. And I've listened to the testimony. I've observed the demeanor of all of the witnesses, and I still can't get my brain around the fact that we have affluent grandparents that live 12 hours away, and these children have been in foster care three times, and they have an uncle who is a school superintendent with a doctorate. These children have been failed by their biological family too many times.
I find that it's-and it's clear to me. There is no question in my mind that it is best for [J.S.] and [A.S.] to be adopted by their foster family. They can continue in their same school. They can continue with their same therapist. And, most importantly, they can continue to pretty much every other day, weekly contact with their little brother [K.C.] I find that it's true that they have a bond with their foster parent, and that's good. They don't have a bond with their grandparents. Their grandparents haven't seen them in almost two years. That's not my fault. That's not [J.S.] or [A.S.]'s fault. It's not financial fault. They didn't see them before they came into foster care.
I find that it's in their best interest that they remain in their current placement, that they not be moved without a court order, that to move them and uproot them from [K.C.] will cause them *583 irreparable emotional and mental damage, and I'm not doing that to these children. It's not in their best interest, and I find that by clear and convincing evidence. And on down the road once they get adopted by the foster family if the foster family wants to let the grandparents have contact, I'm fine with that [.]
Was the court's order backed sufficiently enough by the evidence?
C. Termination-Hearing Evidence
DHS moved to terminate Clark's rights in May 2018. On 8 June 2018, the court entered an agreed visitation order permitting visits by the Sargents, the children's grandparents. The termination hearing was convened on 21 June 2018. Here is a summary of the testimony.
The children's therapist, Christina Rappa, testified that A.S. and J.S. had been diagnosed with anxiety and attention-deficit disorder but had progressed a lot since the case started. When asked by the ad litem if there was anything that Rappa recommended to help the children transition to live with their grandparents in another state, Rappa said:
I think that they should-that's a hard question. I think obviously they need to continue with counseling wherever they go to be able to process the feelings that are going to come with this. They have-yesterday at our visit they were able to process a lot of anxiety related to being moved if that should happen. We kind of worked on the pros and cons of whether they would stay with foster parents or move with their grandparents, and their biggest concerns is being separated from [K.C.].
Rappa agreed that losing the sibling bond with K.C. would be detrimental to A.S. and J.S. On cross-examination, Rappa stated that the children had spoken with their sibling A.W. in Texas on two occasions during family sessions but that she had not factored in A.W. as part of her work or recommendations. On redirect, Rappa confirmed that the children have "characteristics of attachment to their foster family" and enjoy the good food, safety, cuddles, and seeing K.C. On recross-examination, Rappa stated that the "pro" the children listed of going to grandparents was "[t]hey're family."
Washington County DHS case supervisor Andrea Emerson prepared a court report, an ICPC home-study request, and a case-contacts report for the termination hearing. The relative home study was approved for A.S. and J.S.'s grandparents, Bari and James Sargent. The approval date was 15 April 2018, and the report states that Indiana should "supervise the placement and must concur with closure." The Sargents passed the test with flying colors. The detailed report is in the record, so we will not add to this opinion's length by reciting all the information the report contains, none of it detrimental to them. It suffices to report that the Indiana Department of Child Services positively recommended the Sargents for ICPC placement, concluding in part that the "family is interested, willing, and fit."
Despite the previously completed and favorable home study from Indiana, the DHS court report does not identify any person, not even the Sargents, as interested relatives. The box checked under "DHS recommendations" is "proceed toward [DHS] custody with parental rights terminated." Yet when asked by mother's counsel, "Ms. Emerson, are you recommending the children be placed with the grandparents according to the approved ICPC?" Emerson replied, "Yes." Emerson also told the court, "Regarding the ICPC, it is approved. Unfortunately, I didn't get to let the grandparents have a visit because my schedule was crazy the last couple *584 of weeks[.]" In other words, DHS told the circuit court during the termination hearing that it recommended that J.S. and A.S. be placed with their grandparents in Indiana, totally contradicting its written report to the court.
Misty Clark testified that she wanted her children to live with their grandparents in Indiana if the court chose not to return custody to her. She said that she has a brother who is a school superintendent who knows about special needs and could help her parents with the kids. Clark stated that she is the only one who had moved away and that there are multiple generations of her family in Kokomo, Indiana, who would provide support to her parents raising the children. She told the court that her parents had always stayed in touch with the kids. In her words:
They've sucked it up for the kids's [sic] sake. I can be a very difficult person to deal with, and they've always continued to maintain contact with them.... [A]lways came out of state to visit them no matter where we lived whether it was Arizona or here [in Arkansas]. They are always staying in contact with them up until they were placed in foster care this last time.
Clark testified that her parents have relationships with all the children and would facilitate and allow visitation between all four of her children, including A.W. in Texas. Her parents were willing to provide transportation for K.C. so that he could visit with his siblings in Indiana.
On cross-examination by the ad litem, Clark admitted that the children had been in DHS custody twice in Arizona and once in Arkansas. During the first Arizona removal, Clark explained that the kids had telephone visitation with her parents, but the DHS case "never got as far as this, so it never came up about placement with family." The second time the kids were in DHS custody in Arizona, Clark explained that "they agreed to let the children come home [to Clark] as long as I agreed to move back to Indiana where I would have help from family." Clark said that she moved back to Indiana with the kids but that her parents did not see the kids for a year after she moved to Arkansas, and then again for a year while the children have been in foster care, totaling two years that the grandparents had not seen the children.
Bari Sargent, Clark's stepmother, said that she wanted to adopt the children but had not seen the kids for about two years. She explained why she had not seen the children:
[T]hey [Brian Clark and Misty Clark] were fighting a lot. There was a lot of stress, a lot of drama, and we didn't want to be in the middle of that, and then they were put in foster care. And we called CPS the day after we found out that they had been put in foster care again, and we called them the next day and said, you know, we want these children.
Bari said that she had sent gifts and birthday cards to A.S. and J.S. in the last two years. She stated that a strained relationship with Misty made it hard to communicate and contact the kids once they moved to Arkansas and that they did not want to be "in the middle of the ugly" and so they did not visit.
On cross-examination and when questioned by the circuit court, Bari said that they (the Sargents) contacted DHS when the children were removed in Arizona and in Arkansas. She explained that when they contacted Arkansas DHS, she was told that "it has to go to another department because you're out of state. It will probably be at least six months before you hear from anyone." After not hearing from anyone for six months, the Sargents began calling. DHS did not return many of the 32 *585 to 33 phone calls made; and for their sustained efforts the Sargents never received any requested visitation, not even phone visitation-"nothing." After "going over the head" of the unresponsive local DHS office and contacting Mischa Martin (the director of the Division of Children and Family Services) in January and April 2018, Bari received a request from the State of Arkansas to the Indiana Department of Child Services for an ICPC home study.
Bari expressed a strong desire during the termination hearing that the children live with her and her husband in Indiana. She also said they want to adopt the children. Bari said that they could provide for all the children's needs, including counseling, and that they had wanted the children since the children were placed in foster care and that they have rooms set up for them. She told the court how she would facilitate visits between all four children because they were all her grandchildren. When asked why she thought it is in the children's best interest to live with them in Indiana, Bari said:
Because there is lots of family. They have aunts, uncles, cousins. I just think they need to be with family who love them. And I'm-I'm sure that foster parents love them too, and I appreciate the fact that they've cared for them. I really do. But I think they need to be with their family.
She explained that when the kids were taken into state custody twice in Arizona and placed in three separate foster homes, the Sargents had tried to take the kids and have them live in Indiana. According to Bari, Arizona would not allow the children to be placed temporarily with the Sargents unless the Sargents could fly the children from Indiana to Arizona for weekly visits with Misty. But because they could not fly the children back and forth from Indiana to Arizona on a weekly basis as Arizona law required, the children had to remain in separate foster homes in Arizona.
James Sargent, Clark's father, corroborated his wife's account. He said that since April 2017 when they had been informed by A.W.'s grandmother that A.S. and J.S. were in foster care in Arkansas, they tried to contact DHS more than thirty-two times. He testified that DHS never told them when court was being held or that they should come to Arkansas if they wanted the kids. The only court hearing that James was notified about was the termination hearing, which he attended. He said that he thought it was in the children's best interest to come to Indiana, where they have family who wants them, loves them, and will take care of them.
James said that after the Arizona case was closed on the condition that Misty and the kids move back to Indiana, they stayed in Indiana about eight or nine months and that he thought Misty was doing better when she and Brian moved to Arkansas.
The record also contains an email that James sent to Director Martin in late January 2018.
State director DHS Mischa Martin
My name is James Sargent and I was given your name + E-mail address by Sheri Williamson. The reason I'm contacting you is that I am the grandfather of [A.S. and J.S.]. Their mother is Misty Clark & they reside in Fayetteville, Arkansas. The children are in foster care and have been for almost a year. As we understand it, this is the fourth time that the children have been in foster care.
I talked to Hailey Megan, the social worker, many months ago about getting the kids and was told since we live out of state another department would contact us within 6 months. After that time, I called her several times before Christmas.
*586 She said she would call me back in a few days and take the information that was needed to get the process started. I called several times in December and have been calling her constantly since the first of the year and left messages on her phone. I cannot get her to return my calls.
....
As we understand it, the foster parents are willing to adopt the children. The issue is, they have family in Indiana who love them and are willing to take them.
I was told that you are the State Director of DHS for Arkansas and [sic] since I cannot get any cooperation from the people in Fayetteville, would you please help us?
Thank You
James W. Sargent
The 21 June 2018 CASA report in the record indicates that the CASA advocate recommended that A.S. and J.S. be placed with the grandparents in Indiana because it was in their best interest.
Rebecca, who is J.S. and A.S.'s foster mother, testified that the children had been in her home for 437 days. She said that the children had gone from being angry, anxious, and withdrawn to being outgoing, loving, and caring and that the kids had made much progress academically. She testified that her family was willing to adopt J.S. and A.S. "in a heartbeat." She thought that it would be detrimental to the children to be taken away from their brother K.C. because he is "the one thing that they have had solid for his whole life." She testified that A.S. and J.S. also had contacted A.W. "for a short period of time before she was removed, and they still have a strong bond with her." She said that if she could adopt J.S. and A.S. she would continue to allow contact with K.C.
Brian Clark, K.C.'s father, said that he allows K.C. to spend the entire week during the summer with his siblings in Rebecca's foster home. Brian believed it would be "absolutely" detrimental to K.C. to allow J.S. and A.S. to move to another state with their grandparents. He expressed concerns that Misty's extended family was not "what I would call a close-knit family by any means." He stated that he could count on one hand the number of times Misty's parents visited the children once they moved back to Indiana but agreed that the kids were well taken care of in Indiana and there was not a reason for the grandparents to attempt to gain custody of the children.
II. The Circuit Court's Clearly Erroneous Decision
Misty argues that the circuit court erred in granting the termination petition and directing DHS to pursue adoption of J.S. and A.S. by their foster parents. Sibling bonds are "impacted-and possibly destroyed-when children in the foster-care system become subject to a stranger, or third-party adoption," she urges. Clark also presses that Arkansas's adoption laws would make the children legal strangers to their relatives, including their grandparents, for all purposes.
The standard of review in appeals of termination of parental rights is de novo, but we reverse a circuit court's decision to terminate parental rights only when it is clearly erroneous. Ullom v. Ark. Dep't of Human Servs. , 340 Ark. 615, 12 S.W.3d 204 (2000). A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a distinct and firm conviction that a mistake was made. Wade v. Ark. Dep't of Human Servs. , 337 Ark. 353, 990 S.W.2d 509 (1999).
As all of the parties have acknowledged in their briefs to this court, our supreme court overruled many court of appeals *587 cases when it held in Ellis v. Arkansas Department of Human Services , 2016 Ark. 441, at 10, 505 S.W.3d 678, 683, that the statutory preference that a juvenile be placed with a relative applies throughout a dependency-neglect case. See Ark. Code Ann. § 9-28-105 (Repl. 2016) ("In all custodial placements by the Department of Human Services in foster care or adoption, preferential consideration shall be given to an adult relative over a nonrelated caregiver[.]").
In Ellis , the father appealed a permanency-planning order that denied his motion to consider placing his child with his brother, the child's uncle. The circuit court refused to consider the uncle's satisfactory home study, although DHS had recommended that the child be placed with the uncle. Instead, the circuit court ordered that the child remain in the foster home and changed the case goal to adoption. On appeal, the father argued that the court's refusal to place the child with the uncle violated the state's public policy to preserve and strengthen the juvenile's family ties when it is in the child's best interest. Our supreme court agreed with the father and held that the circuit court erred when it did not consider the home study and did not apply the statutory preference for relative placement given the completed and satisfactory relative home study.
DHS is technically correct that Ellis did not involve relative preferences during the termination phase; but Ellis expressly overruled Davis v. Arkansas Department of Human Services , 2010 Ark. App. 469, 375 S.W.3d 721. And Davis was a termination-of-parental-rights case in which this court rejected a mother's argument that terminating her rights was not in her child's best interest because the circuit court did not allow more time for the grandmother to fix deficiencies identified in her home study or to explore a less restrictive placement of the children. This court reasoned that the termination-of-parental rights statute was silent on the point; therefore, there was no mandate that relatives were given preferential treatment during a termination hearing. Davis , 2010 Ark. App. 469 at 7, 375 S.W.3d at 725.
The important fallout from Ellis seems to be that strong bonds and an extended stay with a foster family do not alone defeat the statutory preference for a relative placement. This case is also unlike other pre- Ellis cases, for example, Roberts v. Arkansas Department of Human Services , which this court affirmed in part because of "instability in the family [and] safety-and-credibility issues with the relatives." 2016 Ark. App. 226, at 7, 490 S.W.3d 334, 338. We do not have facts like those in Roberts here. Each termination-of-parental-rights case is decided on a case-by-case basis, and the circuit court's decision in this case to forgo relative placement as a permanency strategy for the two children was clearly erroneous given the facts.
The circuit court's best interest determination in this case was mistaken because it was, as we have just said, grounded in clearly erroneous factual findings. The court was clearly wrong about the grandparents not wanting to be involved in the case. The record contains ample evidence that the grandparents wanted to be involved and that their sustained effort was rebuffed by DHS. The circuit court faulted the Sargents for not being at any of the prior hearings; the record, however, lacks any evidence that DHS notified them about any of the previous hearings. The record does show that the Sargents' consistent attempts to communicate with some Arkansas authority about the children fell into a black hole. After the children were removed from the home, DHS had a duty to try to locate grandparents and communicate *588 with them. Ark. Code Ann. § 9-27-355(b)(1)(A)(ii)-(iii), (B)(ii)(a) - (c) (Supp. 2017). It failed to do so. The circuit court even believed that the Sargents called DHS at least 32 times. It also had the email before it wherein James went to the state director and pleaded his case for some meaningful inclusion. Contrary to the circuit court's statements and related implications, the record demonstrates that the Sargents sought to have the children placed with them almost from the outset of the case but were more or less totally ignored by DHS, until James contacted director Mischa Martin. And even then the Sargents never received telephone visitation although such visitations were authorized by the court. And it bears repeating that DHS recommended to the circuit court that the children be placed with the Sargents.
That the children had been involved in prior removals in another state (Arizona) held sway with the circuit court, too; but those events were manifestly not the Sargents' fault. The undisputed testimony presented to the circuit court was that the children had to have weekly visits with Misty, in Arizona , so it was not feasible for the grandparents to have fostered the children in Indiana if the children had to be sent back on a weekly basis to Arizona to comply with Arizona law. Arizona law, not the grandparents' will, was the deciding factor in that scenario. And Arizona closed its case when Misty agreed to move to Indiana. Arizona apparently recognized that the Sargents in Indiana were good for the family. The circuit court clearly erred in chastising the Sargents for the Arizona events and laying blame at their feet. The circuit court also stated that the children suffered "adjustment disorder" because they had been in foster care three times. There is no support for this conclusion in the record. The children's therapist testified about anxiety and about attention deficit disorder.
The evidence demonstrated that the Sargents love their grandchildren, had visited them, provided them gifts, wished to keep them in the family, and rather doggedly pursued that course. When told by this state's authorities to wait, they waited. When they tired of waiting, they made their intentions known, and in a mature manner. And they did not vacillate. That their relationship with Misty was strained was the reason to not be involved in the "ugly" or "drama" that Misty created for herself.
The deeper issue this case brings out, as Misty argues, is that all familial bonds, including grandparent and sibling bonds, are affected by third-party adoptions. The court recognized that an adoption would sever the legal relationship between the children and grandparents, but it also said, "[O]n down the road once they get adopted by the foster family if the foster family wants to let grandparents have contact, I'm fine with that[.]" DHS contends that these kinds of statements do "not necessarily foreclose eventual permanent placement with or near K.C. ... or the grandparents from petitioning to adopt the children." "The grandparents could be an adoptive placement for the children if they are able to meet all the necessary child protection standards and successfully petition to adopt the children," says DHS.
DHS is mistaken on the law. An adopted individual becomes a stranger to his or her blood relatives, save one exception for sibling visitation. See Ark. Code Ann. § 9-27-341 (c)(1) (Supp. 2017); Ark. Code Ann. § 9-9-215 (Repl. 2016); see also Suster v. Ark. Dep't of Human Servs. , 314 Ark. 92, 97, 858 S.W.2d 122, 125 (1993) ("These statutes point to a public policy which, in determining what is in the child's best interest, favors a complete severing of the ties between a child and its biological family when he is placed for adoption.").
*589 The Sargents are not parties to this case and would not have standing to intervene as a matter of right in a subsequent adoption proceeding should the termination be affirmed. See Suster , supra (affirming denial of intervention as a matter of right where the appellant's rights as a grandparent were derivative of her daughter's parental rights and as a result were terminated when her daughter's parental rights were terminated); Stricklin v. Ark. Dep't of Human Servs. , 2017 Ark. App. 441, at 6, 528 S.W.3d 321, 325 ("[B]y waiting to seek intervention until after Everett's parental rights had been terminated, Stricklin lost her status as great-grandmother."). And even if the grandparents could be part of the case in its post-termination phase, no relative preference is given to grandparents over foster parents under this court's case law. Cowan v. Ark. Dep't of Human Servs. , 2012 Ark. App. 576, 424 S.W.3d 318. And if the children are not placed with the grandparents now, it is unlikely a court will allow them to adopt the children later.
The circuit court believed termination of parental rights and adoption by the foster parents would be in the children's best interest because it would keep them in close contact with K.C. The court, however, did not consider their relationship with A.W., who is also a sibling. The grandparents have a longstanding relationship with all four children and stated that they would facilitate visits between all the children. The court could have placed the children with their grandparents in Indiana and resolved the permanency question for the children. Ark. Dep't of Human Servs. v. Jones , 97 Ark. App. 267, 248 S.W.3d 507 (2007) (affirming circuit court's decision to place custody of a child with his paternal grandparents who lived in another state and close the case). The court instead found that placement with the grandparents in Indiana could sever the bond between the three siblings (K.C., A.S., and J.S.), presumably because of the physical distance between Indiana and Arkansas. With A.S. and J.S. no longer in foster care, K.C. would not see them as frequently as he would if they were to remain in the foster home with the foster parent caring for all three children under the arrangement with Brian Clark. Yet by terminating Misty's rights the court, in fact, severed all legal relations between the children and their extended family. All things considered, the decision to forgo a relative-placement option in favor of termination was clearly wrong under the circumstances. We therefore reverse the termination and remand for proceedings consistent with this opinion.
Reversed and remanded.
Abramson and Murphy, JJ., agree.

A.S. and J.S.'s father, Jeffrey Avery, was also found to be an unfit parent and his parental rights were also terminated. Avery is not a party to this appeal.