Cite as 2024 Ark. App. 631

# ARKANSAS COURT OF APPEALS
## DIVISION II
### No. CV-24-412

| | |
|---|---|
| ANTONIA DANIEL CORNIER<br><br>APPELLANT<br><br><br>V.<br><br><br>ARKANSAS DEPARTMENT OF<br>HUMAN SERVICES AND MINOR<br>CHILDREN<br><br>APPELLEES | Opinion Delivered December 11, 2024<br><br>APPEAL FROM THE WASHINGTON<br>COUNTY CIRCUIT COURT<br>[NO. 72JV-22-446]<br><br><br>HONORABLE STACEY ZIMMERMAN,<br>JUDGE<br><br><br>AFFIRMED |

**WAYMOND M. BROWN, Judge**

Appellant Antonia Cornier appeals the order entered by the Washington County Circuit Court terminating her parental rights to her three children, MC1, born on October 20, 2016; MC2, born on June 2, 2020; and MC3, born on October 9, 2021.[1] Appellant argues that the circuit court erred in terminating her parental rights based on the statutory grounds and for finding that termination was in the children's best interest. We affirm.

The Arkansas Department of Human Services (DHS) opened a protective-services case on the family on August 2, 2022, for failure to protect. Anthony was arrested for choking appellant in front of the children. The family was referred to Safe Care, and services

---

[1]The circuit court also terminated Anthony Cornier-Ramos's parental rights to the children; however, he is not a party to this appeal.

were to begin on August 15. However, on August 15, DHS was contacted by the Fayetteville Police Department informing DHS that appellant was being arrested for child endangerment. Appellant had gone into Walmart and left the children in the vehicle unattended for twenty to thirty minutes. A seventy-two-hour hold was placed on the children. DHS filed a petition for emergency custody and dependency-neglect with supporting affidavit on August 17. An ex parte order for emergency custody was filed on August 18. In the probable-cause order filed on August 18, the circuit court found that there was probable cause for DHS to take custody of the children for two reasons: (1) appellant left the children unsupervised in the car, and (2) the parents have a violent relationship. The court further found that probable cause still existed for the children to remain in DHS's custody. The children were adjudicated dependent-neglected in an order filed on September 16, based on neglect and parental unfitness. The parties stipulated to the finding of dependency-neglect based upon the allegations in the petition and affidavit filed by DHS on August 17. The goal of the case was reunification, and the children were placed in a trial home placement with appellant.

Appellant filed a motion for emergency hearing on October 13, contending that she wanted her trial home placement with the children to be reinstated since it had been terminated and the children had been placed back in foster care on October 4 after she had left the children in the vehicle unattended while dropping off paperwork at the DHS office. DHS responded on October 21, contending that the trial home placement should not be reinstated. In an order filed on January 4, 2023, the circuit court denied appellant's request.

2

Appellant was granted supervised visitation with the children for four hours, once a week. A review order filed on March 29 stated that there had still been issues with appellant's supervised visits in that she was resistant to redirection from DHS, and she had had emotional outbursts with DHS workers in the children's presence during recent visits. The circuit court found that appellant did not understand how her emotions and actions impacted her children and that she continued to allow her emotions to "rule her actions during her supervised visits."

DHS filed a motion for suspension of supervised visitation on June 14, alleging that appellant had "consistently demonstrated a pattern of inappropriate behaviors, including ongoing emotional outbursts, failing to listen or respond to redirection by DHS staff, and continuing to make negative comments about DHS staff." Additionally, the motion stated that appellant had "approached the foster family in public, while the children were present, physically took one child to place them in her lap and demanded that the foster family allow her to see the children." When the foster family attempted to redirect appellant and attempted to leave the situation, appellant followed them until they left the building with the children. According to the motion, MC1 had told the ad litem and the foster parents that she did not want to have visits with appellant. The circuit court entered an order the following day suspending appellant's visitation "until such time as it can be conducted in a therapeutic setting with [appellant] and the children."

A permanency-planning hearing took place on August 2. In the order filed the same day, the circuit court found that appellant had not made significant, measurable, sustainable

progress towards reunification and that she had failed to address "the root causes of this case, namely that [she] has not shown that she can keep the children safe from harm and [she] has not shown that she can control her emotions and meet the children's emotional needs as she keeps subjecting the children to a toxic environment." The circuit court changed the case's goal to authorizing a plan for adoption with DHS filing a petition to terminate parental rights.

DHS filed a petition for termination of parental rights on August 29 alleging the following grounds for termination: (1) twelve-months' failure to remedy;[2] (2) subsequent other factors;[3] and (3) aggravated circumstances—little likelihood of successful reunification despite a reasonable offer of services.[4] Appellant filed a response on September 26 denying the material allegations of DHS's petition and asking the court to deny the petition. Alternatively, appellant asked the court to place the children with either her parents or brother "should the Court grant [DHS's] Petition for Termination of Parental Rights."

Appellant filed a motion for summary judgment on October 8, and DHS and the minor children filed a joint response on October 17. Appellant filed a motion for clarification on November 1 seeking guidance on whether she could give MC1 a card for her upcoming birthday. A joint response was filed on November 7 asking the court to enter an

---

[2]Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)* (Supp. 2021).

[3]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)*(a)*.

[4]Ark. Code Ann. § 9-27-341(b)(3)(B)(ix)*(a)(3)(A)*.

order determining whether appellant may give MC1 a gift and, if so, outlining the parameters. A joint petition for contempt was subsequently filed on November 9 alleging that appellant had contacted the children and their foster parents as they were riding bikes on the greenway and rode past appellant and Anthony. Appellant could be heard saying "that's them," and then both parents began calling out MC1's and MC2's names. MC1's mood became "somber for a while," and she stated that she was glad that the incident did not happen close to where they lived "because she was afraid [that] they would have to move if her parents knew where they lived." The motion alleged that appellant's behavior was in direct violation of the court's orders. Appellant filed a response on November 10 contending that she did not seek out contact with the children and that it was just mere happenstance that they crossed paths and that she did not willfully violate a court order. Appellant asked that the petition for contempt be denied. A hearing took place on November 16, and the circuit court entered an order on November 17 finding appellant in contempt for her actions that took place on the greenway. Appellant was sentenced to twelve hours in the Washington County Detention Center with nine days suspended for one year on the condition that she follow the court's orders. The order stated that the parents were to have "NO CONTACT whatsoever with the children!" This included no sending gifts or having others contact the children for them.

The termination hearing took place in stages because it had to be continued several times.[5]  The circuit court granted DHS's motion to terminate appellant's parental rights based on twelve months failure to remedy and subsequent other factors.  The order was filed on April 3, 2024.  Among other things, the circuit court found that termination of parental rights was in the children's best interest because the children are adoptable and that they would face potential harm if placed back in appellant's custody.  Appellant timely appealed.

Appellant argues that the circuit court erred in terminating her parental rights because the evidence did not support the statutory grounds for termination and in finding that termination was in the children's best interest.  Termination of parental rights is a two-step process requiring a determination that the parent is unfit and that termination is in the best interest of the child.[6]  The first step requires proof of one or more statutory grounds for termination; the second step, the best-interest analysis, includes consideration of the likelihood that the child will be adopted and of the potential harm caused by returning custody of the child to the parent.[7]  Statutory grounds and a best-interest finding must be proved by clear and convincing evidence, which is the degree of proof that will produce in the fact-finder a firm conviction regarding the allegation sought to be established.[8]  We

---

[5]The hearing took place on October 18 and December 14, 2023; and January 25 and February 29, 2024.

[6]*Smith v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 470, 610 S.W.3d 161.

[7]*Id.*

[8]*Id.*

6

review termination-of-parental-rights cases de novo.[9] The appellate inquiry is whether the circuit court's finding that the disputed fact was proved by clear and convincing evidence is clearly erroneous.[10] A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made.[11]

The purpose of the termination-of-parental-rights statute is to provide permanency in a child's life in all instances in which the return of the child to the family home is contrary to the child's health, safety, or welfare, and it appears from the evidence that a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective.[12] Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child.[13] Proof of only one statutory ground is sufficient to terminate parental rights.[14]

One ground relied on by the circuit court when terminating appellant's parental rights was the subsequent-other-factors ground, which provides that other factors or issues

---

[9]*Id.*

[10]*Id.*

[11]*Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007).

[12]Ark. Code Ann. § 9-27-341(a)(3).

[13]*Shaffer v. Ark. Dep't of Hum. Servs.*, 2016 Ark. App. 208, 489 S.W.3d 182.

[14]*Burks v. Ark. Dep't of Hum. Servs.*, 2021 Ark. App. 309, 634 S.W.3d 527.

arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the juvenile in the custody of the parent is contrary to the juvenile's health, safety, or welfare and that, despite the offer of appropriate family services, the parent has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate the parent's circumstances that prevent the placement of the juvenile in the custody of the parent.[15] In granting DHS's petition on this ground, the order stated in pertinent part:

> Specifically, the original Petition for Dependency-Neglect and Emergency Custody was filed in this case on August 17, 2022, after the Department assumed emergency custody of the children on August 15, 2022. Since that time, other factors have arisen that demonstrate that placement of the juveniles in the custody of their parents is contrary to the juveniles' health, safety, or welfare and that parents have manifested an incapacity or indifference to rehabilitating their circumstances.
>
> . . . .
>
> As to the mother, Antonia had the children on trial home placement from August 18, 2022 until October 4, 2022, when DHS had to end the trial home placement due to Mother leaving the children unattended in her vehicle while she was at the DHS office. The reason the case opened was due to Mother leaving the children unattended in her vehicle while she went into Walmart. Mother's visits then returned to being supervised by DHS but were never able to move to even unsupervised due to Mother's consistent emotional outbursts and refusal to engage in redirection by the Department. Mother's failure to cooperate during the supervised visits led to a suspension of her visits on June 15, 2023 and the Court stopped visits entirely at the permanency planning hearing. Mother's behavior towards foster parents throughout the case has also been troubling. In November of 2022, Mother approached foster mom and [MC3] in the Hobby Lobby parking lot after dark. Mother did not explain who she was and instead used her then-employment at Hobby Lobby as an excuse to see if foster mom "needed help," despite not interacting with foster mom while she was inside the store. Then, as recently as June of this year, Mother approached foster mom and dad at the Fayetteville Public Library, while they were there with all three

---

[15]Ark. Code Ann. § 9-27-341(b)(3)(B)(vii)(*a*).

children, despite knowing that she cannot have contact with the children outside of the supervision of DHS. Mother grabbed [MC2] and put her in her lap and attempted to grab [MC1] as well. Foster mom testified that [MC1] was visibly uncomfortable and appeared to be afraid of her mother. Both foster parents told Mother multiple times that her behavior was inappropriate, and the foster family had to end up leaving the library due to Mother's ongoing harassment. In addition, Mother told foster parents that they had to let her see her children and that they, foster parents, would "reap what they sow." Upon hearing the uncontroverted testimony about these incidents at the permanency planning hearing, the Court found specifically that "this is threatening, bullying behavior by Mother" and that Mother had directly violated the orders of this Court multiple times by engaging in that behavior.

. . . .

The Court finds that despite the offer of appropriate family services by the Department, that numerous [subsequent] issues have demonstrated the parents['] inability to remedy their circumstances. . . . As to Mother, the Court finds that Mother's behaviors and testimony throughout the case has shown that she does not get it; she is still trying to justify her inappropriate behaviors towards DHS workers and foster parents instead of demonstrating that she understands that these behaviors are confusing and harmful to her children.

In contending that the evidence did not support termination under the subsequent-other-factors ground, appellant states that a single lapse in judgment by leaving the children in the car during the trial home placement is not enough to support termination. She cites *Kight v. Arkansas Department of Human Services*,[16] to support her argument. However, *Kight* is distinguishable. In *Kight*, we reversed the termination order where the mother had remained sober for six months prior to termination despite a few lapses in judgment, such as fraternizing with the children's drug-abusing criminal father and relapsing once during the case while pregnant. The evidence in *Kight* showed that the older child was stable and doing

---

[16]87 Ark. App. 230, 189 S.W.3d 498 (2008).

well in Kight's care despite Kight's drug use, and as soon as the child was removed from Kight's custody, Kight was serious about getting the child back. Here, appellant was granted a trial home placement with the children and had that trial placement revoked once she left the children in the car unattended at DHS. She was then granted supervised visitation, which was revoked due to her behavior at those visits. Appellant also violated the court's order of no visits, at least twice, and was found in contempt and sent to jail for twelve hours for having contact with the children against court orders. Appellant's progress diminished as time progressed in this case. After the children were returned to foster care following the trial home placement, appellant never advanced to having even unsupervised visitation before she lost visitation completely. Appellant also argues that the circuit court's credibility finding alone is insufficient to support termination; however, the finding was based on the evidence before the court and pertained to appellant's continued statements that she was sorry for her actions only to repeat them. The circuit court had enough evidence before it to conclude that appellant's parental rights should be terminated based on the ground of subsequent other factors, and we affirm.

Appellant cites the testimony given in her favor at the hearing, which is nothing more than a request for us to reweigh the evidence, reevaluate the witnesses' credibility, and evaluate both differently than did the circuit court. However, we do not reweigh evidence in these cases.[17]

---

[17]*See Glover v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 278, 577 S.W.3d 13.

Appellant contends that her behavior was caused by her diagnosis of adjustment disorder with mixed anxiety and depressed mood and disruption of family by separation and divorce. She also maintains that she was discriminated against due to her Marshallese heritage. We do not address these arguments because appellant failed to raise them below. We will not consider an argument made for the first time on appeal.[18]

Next, appellant argues that the circuit court erred in finding that termination of her parental rights was in the children's best interest. Specifically, she contends that there was no evidence that any risk of potential harm continued to exist or that the children's best interest would be served by having appellant permanently and irrevocably removed from their lives. Appellant does not challenge the circuit court's finding that the children are adoptable; therefore, it is waived on appeal.[19] For potential harm, the evidence must be viewed in a forward-looking manner and considered in broad terms; however, a circuit court is not required to find that actual harm will result or to affirmatively identify a potential harm.[20] Additionally, past behavior may be viewed as a predictor of potential harm.[21] Further, the same evidence relied on to support statutory grounds may be used to support

---

[18]*Lewis v. Ark. Dep't of Hum. Servs.*, 2024 Ark. App. 66, 684 S.W.3d 262.

[19]*Black v. Ark. Dep't of Hum. Servs.*, 2018 Ark. App. 518, 565 S.W.3d 518.

[20]*Phillips v. Ark. Dep't of Hum. Servs.*, 2020 Ark. App. 169, 596 S.W.3d 91.

[21]*Id.*

11

potential harm.[22] Such is the case here. Appellant seemed to go backward and eventually lost visitation completely with the children for failing to control her emotions and failing to follow the circuit court's orders. Additionally, appellant testified at the termination hearing that although she had divorced Anthony in August 2023, they had recently begun living together again and had plans to stay together. Anthony has a history of domestic violence against appellant, and it was this violence that caused a protective case to be opened on the family prior to the children's removal. Appellant also admitted at the hearing that she had been violent towards Anthony in the past. A history of domestic violence indicates potential harm.[23]

Appellant also argues that termination of her parental rights was not in the children's best interest because DHS failed to follow the law and give relatives preferential consideration for placement of the children. She cites several cases in which we reversed the termination in favor of relative placement. However, those cases are distinguishable. Appellant's reliance on *Phillips v. Arkansas Department of Human Services*,[24] for her less-restrictive-alternative argument is misplaced. In *Phillips*, appellant's children were in DHS custody and placed with foster parents, and there was no testimony of any relationship they had with their grandparents; thus, the rationale in *Phillips* favoring a less-restrictive alternative

---

[22]*Id.*

[23]*Blasingame v. Ark. Dep't of Hum. Servs.*, 2019 Ark. App. 342, 582 S.W.3d 873.

[24]2019 Ark. App. 383, 585 S.W.3d 703.

12

to termination of parental rights to preserve the children's relationship with a grandparent does not apply. And as in *Phillips*, there was no compelling reason for the court to choose permanent custody rather than adoption and termination of parental rights because there was no reasonable prospect that appellant would eventually reunify with her children as demonstrated by her actions throughout the case.

In *Clark v. Arkansas Department of Human Services*,[25] we held that the circuit court's decision to forgo a relative-placement option in favor of termination was clearly wrong under the circumstances. The instant case is unlike *Clark* in that the grandparents identified in that case had a longstanding relationship with the minor children, and the circuit court was clearly wrong about the grandparents not wanting to be involved in the case.[26] In this case, there was no testimony concerning what, if any, relationship the children had with appellant's parents.

Appellant's contention that *Borah v. Arkansas Department of Human Services*,[27] is applicable to the instant case is also not well taken. In *Borah*, this court held that the circuit court clearly erred by failing to consider placing the child with the paternal grandmother as a less-restrictive alternative to termination of parental rights. The paternal grandmother repeatedly reached out to DHS to have a home study conducted, but the DHS caseworker

---

[25]2019 Ark. App. 223, 575 S.W.3d 578.

[26]*Id.*

[27]2020 Ark. App. 491, 612 S.W.3d 749.

did not turn in the ICPC paperwork until about a month before the termination hearing. In the instant case, DHS did not send the ICPC paperwork to appellant's parents until after the goal of the case was changed. The circuit court noted that there was a point when appellant did not want the children in Hawaii with her parents because she wanted to work on reunification. Though similar, there is a critical difference between *Borah* and the instant case because in *Borah*, the child had a good preexisting relationship with her paternal grandmother, and termination would jeopardize that relationship. Again, in this case, there is no evidence of such a relationship, and there is no indication that the children's grandparents continued to reach out to DHS for placement. Also in *Borah*, the foster parents did not intend to adopt the child, whereas there was evidence that the foster parents in this case are willing to adopt the children. Accordingly, we affirm the circuit court's decision to termination appellant's parental rights instead of opting for relative placement.

Affirmed.

WOOD and MURPHY, JJ., agree.

*Elizabeth James*, Arkansas Commission for Parent Counsel, for appellant.

*Kaylee Wedgeworth*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.