Cite as 2020 Ark. App. 491

# ARKANSAS COURT OF APPEALS

DIVISION III

**No.** CV-20-435

|  |  |
|---|---|
| | **OPINION DELIVERED:** OCTOBER 28, 2020 |
| AMANDA BORAH AND STEVEN WALLS | |
| **APPELLANTS** | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT [NO. 66CV-19-5] |
| V. | |
| | HONORABLE SHANNON L. BLATT, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILD | |
| **APPELLEES** | REVERSED AND REMANDED |

## ROBERT J. GLADWIN, Judge

Amanda Borah and Steven Walls appeal the Sebastian County Circuit Court's order of April 8, 2020, terminating their parental rights to A.W., born June 17, 2016. Amanda argues that the circuit court failed to apply the Indian Child Welfare Act (ICWA), 25 U.S.C. sections 1902 et seq., and that the Arkansas Department of Human Services (DHS) failed to prove that termination of parental rights (TPR) was in A.W.'s best interest. Steven also challenges the circuit court's best-interest finding, and he contests each of the statutory grounds relied on by the circuit court. DHS and the child's attorney ad litem concede error based on noncompliance with the ICWA and ask that this court vacate the termination order and remand the case for further proceedings consistent with the ICWA. We reverse and remand because the circuit court's best-interest analysis was clearly erroneous.

## I. *Facts*

DHS petitioned the circuit court for emergency custody of A.W. on January 7, 2019. It alleged that Amanda and her ex-husband, Allen John Borah, are A.W.'s parents and that A.W. was dependent-neglected due to parental unfitness and neglect. The attached affidavit states that DHS took A.W. from Amanda's custody on a seventy-two-hour hold because Amanda was unable to provide for A.W., tested positive for amphetamine and methamphetamine, had no food or utilities in the home, had no source of income, and was in a violent relationship with Steven. An ex parte order for emergency custody was filed on January 7.

At the probable-cause hearing on January 14, Amanda stipulated to a finding of probable cause but not to the truth of the facts contained in the affidavit. The circuit court reviewed a final order of protection, which was based on Amanda's allegations of Steven's domestic violence toward her, and a letter stating that Amanda was in residential substance-abuse treatment. The court ordered that Steven pay $62 a week in child support to DHS and directed that genetic testing be referred for Steven and A.W. The court also ordered DHS to notify the Klamath Tribes because Amanda alleged that she is a member of the tribe and provided a membership number.

On February 25, the parties stipulated to an adjudication of dependency-neglect based on Amanda's parental unfitness due to continued drug use, the lack of working utilities in the home, the lack of food in the home, and the continuing domestic-violence issues in the home. The goal of the case was reunification, and Amanda was granted visitation as arranged by DHS. The court noted that Amanda had provided a roll number for the

Klamath Modoc tribe at the probable-cause hearing, that the Klamath Modoc tribe had been notified on February 12, and that the tribe had not responded nor contacted DHS; therefore, the court found that "at this time," the ICWA "does not apply." In a separate finding, the circuit court stated, "[Amanda] does not have membership in or descent from an Indian tribe; the legal father does not have membership in or descent from an Indian tribe; the juvenile does not have membership in or descent from an Indian tribe." Amanda was ordered to complete parenting and domestic-violence classes; submit to a drug-and-alcohol assessment and complete the treatment recommendations; submit to random drug screens; complete a psychological evaluation and recommended treatment; obtain and maintain stable housing, employment and transportation; and visit A.W. regularly.

On May 22, Steven was added as a separate party defendant to the case based on his putative-father status. At the review hearing on June 10, the court held that A.W. was in need of DHS services and should remain in DHS custody because of the parents' unfitness. The court also found that Steven is the biological father of A.W. and dismissed Allen John Borah from the case. Drug testing was ordered for Amanda and Steven, and the court found that they had not complied with the case plan or orders. Amanda had not completed drug treatment or a psychological evaluation, and she remained unemployed and refused to complete domestic-violence classes. Steven was unemployed and had not completed drug treatment. He was also arrested for domestic violence during the review period.

At the August 19 review hearing, the court continued custody in DHS, finding that return of A.W. to her parents was contrary to her best interest because of the parents' ongoing drug use. The goal of the case remained reunification, but the court added a

3

concurrent goal of adoption following TPR because of the parents' lack of progress. The court found that the parents had not complied with the case plan and court orders and had used drugs as recently as the weekend before the review hearing. A supplemental order reflects that Steven was $2,910 behind in child support as of July 31.

On December 9, the circuit court held a permanency-planning hearing. The court found that Amanda had partially complied with the case plan and court orders. She had housing and income but no transportation, and she had not completed domestic-violence classes. The court found that Steven had not complied and had not completed any services. The goal of the case was changed to adoption after TPR with a concurrent goal of reunification.

DHS filed a petition for TPR on February 7, 2020, and it alleged the grounds of failure-to-remedy, subsequent factors, and aggravated circumstances. The certificate of service on the petition states that the attorney ad litem and the parents' attorneys were served with a copy of the petition pursuant to Rule 5 of the Arkansas Rules of Civil Procedure. A hearing on the petition was held on March 9, and the circuit court found that the parents had been properly served pursuant to Rule 5.

At the hearing, Chelsea Sewell testified that she is the assigned caseworker, and she described the circumstances of DHS's involvement with the family. She said that Amanda was currently staying with a friend but was not "on the lease" and that she had thirteen different residences throughout the case. Sewell said that Amanda did not have stable income for the duration of the case but reported being employed through a temporary agency. She

said that Amanda does not have reliable transportation other than the bus passes provided by DHS.

Sewell said that Amanda had completed a drug-and-alcohol assessment, which recommended a course of treatment; she went to Gateway for treatment but left against medical advice, and she had a relapse. Amanda did a reassessment, but she did not complete that recommended treatment, which is individual and group therapy. Amanda's last positive drug screen was August 20, 2019, and since then her screens had been negative. Sewell said that Amanda completed parenting classes and had been more cooperative with providing DHS information. She completed a psychological evaluation, but she was not cooperative. It was court ordered that she either retake it or comply with individual counseling, and she has done only half of her counseling. Amanda did not complete domestic-violence classes or couples counseling.

Sewell said that Steven does not have safe, stable, and appropriate housing—he had eight different residences throughout the case—and that he was staying with friends. Sewell could not verify his income and said his employment had been unstable. Steven reported working at Fleetwash. He completed a psychological evaluation, and the recommendations were to go to couples counseling if they were to parent A.W. together, submit to drug screens, and follow any DHS recommendation. He complied with drug screens, and he completed a drug-and-alcohol assessment but not the recommended treatment. And Sewell said that Steven had not been to couples counseling or coparenting sessions. He had also not completed domestic-violence classes, and he did not have reliable transportation. Steven last tested positive for drugs in August 2019. Sewell said that Steven was arrested in February

2020 and has had multiple arrests during the case. As of the hearing date, Steven was over $4,000 behind in child support.

Sewell said that during the pendency of the case, A.W. began to show sexualized behaviors, which are being addressed in play therapy. The parents had not provided any insight and were highly defensive about the issue. Sewell also said that during the pendency of the case, Amanda had a true finding in another case for striking a child in the face, leaving marks. The child was between the ages of seven and seventeen and was staying in Amanda's house.

Sewell testified that there would be a psychological and physical risk of harm if A.W. were returned to both or either of her parents. The parents had not established stability in income, housing, or transportation; their domestic-violence issues had not been addressed in counseling or through domestic-violence classes; and neither had completed a second session of drug-and-alcohol treatment. Sewell said that they had been "clean," but it was still recommended—through assessment and psychological evaluation—that they receive treatment.

Sewell testified that A.W. had no significant barriers to adoptability; she had no significant health issues; and she was young, healthy, and very adoptable. She said the foster placement does not wish to adopt, but other persons had expressed interest. She said that even if the court found A.W. were not adoptable, the risk of harm would outweigh any consideration of adoptability.

On cross-examination, she said,

> I don't know if I've met his mother, Linda Herrera, prior to today. I don't recall meeting her face-to-face. The lady who's here in the courtroom, yes. I heard

her introduce herself. Yes, ma'am. No, I haven't met her. I'm saying I know who you're talking about. She may have attended. I don't, I mean, I can look back at my court notes. Yes, it's true that she has reached out to me as a potential placement. We've spoken on the phone about placement, yes, ma'am. As to the efforts I've made on that relative placement, well, I've filled out all the paperwork for her to be considered for ICPC, because she is out-of-state placement. She's in Oklahoma. It's been over a month ago since I've done that. Previously, I know that we considered her for placement. She was residing in Arkansas. She lost her housing in Paris. And then there was some concern with how the mother was reacting to her being considered as a placement. Yes, the mother's reaction. As for if that's something that would prohibit [DHS] from looking into a relative, well, if we feel that it wouldn't be safe for the child to be there, yes. As to the indications I have that the paternal grandmother would not be safe, well, there were concerns about the grandmother and the child due to how the mother became very irate. She disclosed or tried to disclose particular history for that grandmother, which obviously, you know, it's hearsay. So I can't say. I didn't look into that.

I mentioned she lost a house in Paris; I believe it was in Paris. I had gotten that information from Steven Walls. I don't know how long she's resided in Oklahoma. Yes, ma'am, I've completed the ICPC paperwork. I asked for an update but I . . . have not been given an update on the status of the ICPC. I know that I've turned all the paperwork in to our ICPC worker and she's turned it in to who she has to turn it into. That's as far as I'm aware at this time. I don't recall when she first reached out to me about being considered for placement. I don't have my contacts printed off, no, ma'am. As for if it was before a month ago when I filled out the paperwork, well, I filled out the paperwork over a month ago. I don't know exactly when it was filled out, but we have talked before. As for if it was sometime last year, well, it would have been in—I don't know. I don't want to say and not—and be incorrect.

. . . .

As for if I intend to follow up on the ICPC with the grandmother, well, I'll continue to work with my ICPC worker. If she indicated a desire to adopt the child, that would be considered, as well.

Tehrina Means is an investigator for Sebastian County DHS, and she testified that she was assigned to Amanda's cases—A.W.'s case and the June 2019 case with a seven-year-old child who had been struck in the face. The child disclosed that Amanda caused the injuries—cuts, welts, and bruises. The investigation resulted in a true finding. Means testified

7

that she would recommend that Amanda be considered a threat to vulnerable populations based on to the victim's injuries, the history of true findings with Arkansas DHS, and the history of true findings in children in another state.

In response to DHS's allegation that she had unstable housing, Amanda testified that she would not say the friend she is staying with is unsafe or inappropriate for A.W. There is another child in that residence around the same age as A.W. Amanda said she had been there for two and a half weeks and that she planned to stay there until she obtained her birth certificate and paid an old electric bill in order to get an apartment. She said that she works at Citi Trend and had for three weeks. Her job is through an employment company, and she makes $9.25 an hour. She said she gets a ride to work with a coworker and that she is on the waiting list for HUD housing. She denied that she refused to take a drug test and explained that she was dehydrated at the time and offered to take it later in the day. She admitted that she got upset when Sewell told her that she would mark it as a refusal. She also said that if she had tested, there is a good chance it would have been positive. She said she had not used methamphetamine in six months, and her last "dirty" urine analysis was on August 20, 2019.

Amanda said she had not completed couples counseling because she and Steven have not resided together or been a couple since December 2019. She could not say if she had any intention of reconciling with Steven. She explained that Sewell was going to look for other services to replace couples counseling, but she had heard nothing back from Sewell. She did not complete domestic-violence classes because she went to the offender's class by mistake, so she began to go to another class. She said that if A.W. could not be with her,

she wanted A.W. to go to her grandmother, Linda Herrera, and that she would be safe there. She said that A.W. calls her grandmother Mamam, and that she recalled telling Sewell that A.W. should not be with anyone other than her parents, but that if she cannot be with them, A.W. should be placed with her Mamam.

Steven testified that he had been "bouncing couch to couch" and that he planned to get into a motel that day. He said that he had a job for the last three weeks at Fleetwash and that his take-home pay was $976. He said he had no pending legal charges and had fines and child support to pay. He said he had two vehicles during the case and had wrecked one and been unable to pay for the other due to losing his job after an arrest. He said he got bus passes from Sewell between owning the two vehicles, and he had requested bus passes since he lost the second vehicle but had not been provided any. He said he needed transportation to go to counseling and to find employment, but it was hard to find a job with domestic-violence on his record. He completed parenting classes and attended some NA meetings, but he had lost some "lists" of his attendance. He said he had been "clean" for six months and that he and Amanda were not together.

Steven said that he spoke to Sewell about placing A.W. with his mother, that he provided Sewell with contact information for his mother, and that Sewell just said, "Okay." He said he did not have many counseling sessions under his belt and that when he and Amanda told Sewell that they were no longer together, Sewell sent a text stating that they did not have to attend couples counseling anymore, so he did not pursue it. He said that visits with A.W. go well and that his daughter loves him and that his rights should not be terminated. He believes he can keep her safe if he were to find housing and that he would

9

ask his mother to keep A.W. during his work hours. He said that if the court granted the termination petition, it would be in A.W.'s best interest to be placed with his mother, a relative, rather than a stranger. He said that he had not completed domestic-violence classes because he did not have transportation. He said that he did have a van for a time after he was ordered to take the classes, and aside from trying to find a job, he did not have a really good reason for not going.

Linda Herrera testified that she had lived in Muldrow, Oklahoma, for the past six months. She denied ever having lived in Paris, and she said she moved from Arkansas when she sold the house there. On July 25, 2019, she gave Sewell her contact information. On August 25, she contacted Sewell again because she had not heard from her, and Sewell told her she had lost her contact information. About a month before the hearing, Sewell "got active on it." Linda underwent a drug screen when A.W. was first taken, and it was negative. She said she has a good relationship with her granddaughter and would like to be considered for placement or even for potential adoption. She is employed and has a vehicle, and she has a two-bedroom home, but DHS has never been there. She said she was able to visit with A.W. over Thanksgiving and on A.W.'s birthday. She said that she had begged to have contact with A.W. but had to go through Amanda and Steven and that she was afraid to cause any ripples or problems. She said that no one from DHS ever reached out to her at any time during this case to provide any type of contact with A.W. or look at her as a visitation or placement resource for A.W.

At the conclusion of the hearing, the circuit court terminated the parental rights of both parents and ordered that the "ICPC home study on the paternal grandmother shall

continue, but [DHS] shall not place without a hearing." The court's order reflects that "due notice of this proceeding" was provided "to the parents" who were served pursuant to Rule 5. The court granted TPR based on each of the statutory grounds as alleged in the petition and found that TPR was in A.W.'s best interest, finding that A.W. is adoptable and that she would be subjected to potential harm if parental rights were not terminated. The circuit court granted DHS authorization to consent to A.W.'s adoption without further notice or consent of the parents.

Both parents filed timely notices of appeal, and this appeal followed. DHS and the attorney ad litem filed a joint response and contend that even though Amanda's argument regarding the circuit court's failure to follow the ICWA is not preserved for appellate review because she did not argue it below, this court should vacate the circuit court's order and remand because DHS failed to notify the Indian tribe of the TPR petition.

## II. *ICWA*

Congress passed the ICWA in response to the "rising concern in the mid-1970's over the consequences to Indian children, Indian families, and Indian tribes of abusive child welfare practices that resulted in the separation of large numbers of Indian children from their families and tribes through adoption or foster care placement, usually in non-Indian homes." *Miss. Band of Choctaw Indians v. Holyfield*, 490 U.S. 30, 32 (1989). The ICWA applies to all state child-custody proceedings involving an Indian child when the court knows or has reason to know an Indian child is involved. 25 U.S.C.A. § 1912(a). "Child custody proceeding" means, and includes, foster care placement, termination of parental rights, preadoptive placement, and adoptive placement. 25 U.S.C.A. § 1903(1). An Indian

child is defined by the ICWA as an "unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe." 25 U.S.C.A. § 1903(4).

[T]he ICWA requires the party seeking termination of parental rights to an Indian child to notify the child's tribe of the proceeding. The pertinent part of the Act reads as follows:

In any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, *the party seeking the foster care placement of, or termination of parental rights to, an Indian child shall notify . . . the Indian child's tribe*, by registered mail with return receipt requested, of the pending proceedings and of their right to intervention. If the identity or location of . . . the tribe cannot be determined, such notice shall be given to the [Secretary of the Interior] in like manner, who shall have fifteen days after receipt to provide the requisite notice to . . . the tribe. *No . . . termination of parental rights proceeding shall be held until* at least ten days after receipt of notice by the . . . tribe or the Secretary.

25 U.S.C. § 1912(a) (emphasis added).

*Masterson-Heard v. Ark. Dep't of Human Servs.*, 2009 Ark. App. 623, at 3–4.

### III. *Standard of Review*

This court recently explained the applicable standard of review as follows:

We review termination-of-parental-rights cases de novo but will not reverse the circuit court's ruling unless its findings are clearly erroneous. *Dade v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 443, 503 S.W.3d 96. A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is clearly erroneous, we have noted that in matters involving the welfare of young children, we will give great weight to the circuit court's personal observations. *Jackson v. Ark. Dep't of Human Servs.*, 2016 Ark. App. 440, 503 S.W.3d 122.

The termination of parental rights is an extreme remedy and in derogation of the natural rights of the parents. *Fox v. Ark. Dep't of Human Servs.*, 2014 Ark. App. 666, 448 S.W.3d 735. As a result, there is a heavy burden placed on the party seeking to terminate the relationship. *Id.* The termination of parental rights is a two-step process that requires the circuit court to find that the parent is unfit, and that

12

termination is in the best interest of the child. *T.J. v. Ark. Dep't of Human Servs.*, 329 Ark. 243, 947 S.W.2d 761 (1997); *Smith v. Ark. Dep't of Human Servs.*, 2013 Ark. App. 753, 431 S.W.3d 364. The first step requires proof of one or more of the statutory grounds for termination. Ark. Code Ann. § 9-27-341(b)(3)(B). The second step requires consideration of whether the termination of parental rights is in the child's best interest. Ark. Code Ann. § 9-27-341(b)(3)(A).

*Atwood v. Ark. Dep't of Human Servs.*, 2019 Ark. App. 448, at 4–5, 588 S.W.3d 48, 51–52.

## IV. *Preservation*

Amanda does not challenge the statutory grounds found in support of TPR. Instead, she argues that there was not clear and convincing evidence that TPR was in A.W.'s best interest because all of the issues affecting A.W.'s permanency and adoptability have not been resolved. She cites *Dominguez v. Arkansas Department of Human Services*, 2020 Ark. App. 2, 592 S.W.3d 723, wherein the TPR order was affirmed, but the case was remanded because of unresolved paternity issues that prevented an adoption.[1] She argues that TPR did not open A.W. for permanency and that an adoption would be premature as ICWA was not applied to the TPR proceedings as required under 25 U.S.C. 1912(f).

TPR to an Indian child is only permissible when "supported by evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). This harm finding must be supported by "testimony by [a] qualified expert witness[.]" *Id.* Additional safeguards for Indian families are established by minimum federal standards that apply when there is a removal of Indian children from their families. 25 U.S.C. §§ 1901–1963. Amanda argues that DHS failed to provide any proof under the ICWA

---

[1]Amanda mistakenly argues in her brief that *Dominguez* reversed the termination of parental rights.

13

within this termination proceeding as required pursuant to 25 U.S.C. § 1912(f). She maintains that without compliance with the ICWA, the termination proceeding at the circuit court that concerned an Indian child is always at risk of being invalidated. *See* 25 U.S.C. § 1914.

Amanda argues that the failure to comply with the ICWA put A.W.'s adoptability in question, which impacts her permanency, her future, and her best interest. Because she contends that the TPR decision did not free A.W. for adoption, she argues that this court should reverse, as it did in *Dominguez*, and direct the circuit court to appropriately decide these issues under the ICWA so that A.W. may receive true permanency without the risk of the proceeding being invalidated and her permanency disrupted.

DHS and the attorney ad litem argue that Amanda's ICWA argument is not preserved for appellate review. However, without citing *Dominguez*, they contend that

> there is an error that affects the child's future permanency: notice of the termination proceedings was not sent to the Klamath Tribe. This would make any future adoption unstable and subject to invalidation under ICWA. Again, any error that would follow the child into an adoptive placement is not in her best interest.

They rely on *Choate v. Arkansas Department of Human Services*, 2019 Ark. App. 387, 587 S.W.3d 553, which held that reversal of an earlier termination decision did not end the underlying dependency-neglect case. Thus, they contend that DHS's error in failing to notify the Indian tribe of the termination proceedings can be corrected by our vacating the termination decision and remanding to the circuit court. They argue,

> Remand is necessary so that DHS can provide proper notice to the Klamath tribe of any future petition for termination of parental rights; if the tribe verifies that Borah is a member and A.W. is eligible for membership in the tribe, then if necessary termination hearings for both parents can be reheard under ICWA evidentiary standards and proper ICWA findings can be made in a termination order.

14

As noted above, this court did not reverse the TPR order in *Dominguez*, but remanded for further proceedings to address the father's rights. In *Dominguez*, the appellant was married to Javier at the time of the child's birth, and Javier's DNA test proved that he was not the biological father. *Dominguez*, 2020 Ark. App. 2, at 2–4, 592 S.W.3d at 725–26. However, no biological father was identified in the case, and Javier's status as legal parent was ignored. *Id.* at 12–13, 592 S.W.3d at 730. This court stated,

> To be clear, we affirm the termination of appellant's parental rights. However, this does not mean that CD is ready for adoption. Due to the unique circumstances of this case, an adoption for CD is premature as a result of the unresolved paternity issues—identification of the true biological father and any rights of a legal father. The circuit court must decide these issues and appropriately consider termination of any rights they may have to achieve the permanency that CD is entitled to receive.

*Id.*

Accordingly, we cannot rely on *Dominguez* to remand in this instance. Unlike the situation in *Dominguez*, the final order herein terminated both parents' rights, leaving no parental right unaddressed. Here, the application of the ICWA cannot be addressed on remand without reversing the circuit court's TPR order. We hold that the ICWA issue is not preserved for appellate review.

Adjudication orders are immediately appealable. Ark. Sup. Ct. R. 6-9(a)(1)(A) (2019). A parent's failure to appeal rulings made in an adjudication order precludes appellate review of those findings in an appeal from a subsequent order. *Ashcroft v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 244, at 8, 374 S.W.3d 743, 747. No party appealed the circuit court's findings that the ICWA did not apply or that neither Amanda nor A.W. were members of an Indian tribe. Further, we have held that compliance with the notice

15

requirements of the ICWA must be raised below in order to be preserved for appellate review. *Lauman v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 564, at 2.

## V. *Best Interest*

Amanda also argues that TPR was not in A.W.'s best interest when she had a relative with whom she was bonded who was ready to accept custody. Steven makes a similar argument. DHS and the ad litem do not address this best-interest argument in their responsive brief.

For their less-restrictive-alternative argument, Amanda and Steven rely on *Clark v. Arkansas Department of Human Services*, 2019 Ark. App. 223, 575 S.W.3d 578, wherein this court reversed and remanded a TPR order due to the circuit court's failure to consider the statutory preference for relative placement. In *Clark*, the grandparents' sustained effort to be involved had been rebuffed by DHS. *Clark*, 2019 Ark. App. 223, at 16, 575 S.W.3d at 587. We noted that no relative preference is given to grandparents over foster parents when TPR is granted. *Id.* at 19, 575 S.W.3d at 589. Thus, Amanda contends that the issue relating to the relatives must be addressed prior to TPR or the rights are potentially gone forever. *Id.*

They also rely on *Phillips v. Arkansas Department of Human Services*, 2019 Ark. App. 383, at 12–13, 585 S.W.3d 703, 709–10, which states,

> The TPR statute sets out two factors that must be considered by the circuit court when the court determines whether TPR is in the children's best interest—likelihood of adoptability and potential harm. *See Chaffin v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 522, at 5, 471 S.W.3d 251, 255. Considerations in making a best-interest finding may include: the preservation of the children's relationship with a grandparent; the severance of child support from a parent; whether a less drastic measure could be employed such as a no-contact order or supervised visitation; whether continued contact with the parent would be beneficial to the children if or when the children are living with a relative and not in an indeterminate state that is working against them; and whether the children are living in continued uncertainty.

16

*See Bunch v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 374, 523 S.W.3d 913; *Lively v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 131, 456 S.W.3d 383; *Cranford v. Ark. Dep't of Human Servs.*, 2011 Ark. App. 211, 378 S.W.3d 851; *Caldwell v. Ark. Dep't of Human Servs.*, 2010 Ark. App. 102; *Conn v. Ark. Dep't of Human Servs.*, 79 Ark. App. 195, 85 S.W.3d 558 (2002). In all these cases, this court reversed the circuit court's TPR orders and demonstrated that TPR is not always necessary, especially given that the public interest behind TPR is to ensure that children will obtain greater stability and permanence and not languish in foster care indefinitely—a circumstance that the children in this case did not face.

In *Phillips*, this court affirmed TPR when the children were in the legal custody of DHS but temporarily placed with relatives, and TPR did not jeopardize these stable relationships that might become permanent adoptive homes for the children. *Phillips*, 2019 Ark. App. 383, at 15, 585 S.W.3d at 711.

Amanda contends that placement with relatives is the preferred goal when accomplishing permanency for children, *see* Ark. Code Ann. § 9-28-1003 (Repl. 2015); Ark. Code Ann. §§ 9-28-105 to -108, and the statutory preference that a juvenile be placed with a relative applies at all stages of a dependency-neglect case. *Ellis v. Ark. Dep't of Human Servs.*, 2016 Ark. 441, 505 S.W.3d 678 (in an appeal from a permanency-planning order, court held that the statutory preference is not limited to initial placements). Amanda argues that despite the parents' and grandmother's "constant requests for placement" of A.W. and the caseworker's testimony that she intended to explore the grandmother for placement, the circuit court terminated her parental rights.

She contends that "[i]n initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interests and welfare of the juvenile and the public." Ark. Code Ann. § 9-27-329(d) (Supp. 2019). Thus, the least restrictive alternative is a relevant inquiry

17

at a TPR hearing. *Lively v. Ark. Dep't of Human Servs.*, 2015 Ark. App. 131, 456 S.W.3d 383 (reversing and remanding TPR for consideration of whether TPR rather than a less drastic alternative, such as a no-contact order or supervised visitation, was in the children's best interest because TPR jeopardized children's relationship with their paternal grandparents, who were most stable influences on children). Amanda contends that TPR was unnecessary when the issue of a less restrictive alternative to termination—placement with the paternal grandmother—was still outstanding. She contends that the factors articulated in *Phillips*, *supra*, weighed in favor of family preservation, i.e., maintaining the relationship between A.W. and Linda; severance of child support from both parents who worked; employing the less drastic measure of supervised visitation; and continued contact between Amanda and A.W. She argues that A.W. was never placed with a relative because of DHS's failures, but no evidence was offered that A.W. would be adversely affected if the case continued for a short period for the placement with her grandmother to be effectuated.

Steven argues that during the course of the TPR hearing, testimony was elicited from Sewell and his mother regarding his mother's numerous attempts to become a placement option at various stages of the case: in July 2019, August 2019, and February 2020. It was not until his mother's third attempt to become a placement in February 2020 that the caseworker began the paperwork to have Ms. Herrera considered as a placement option through ICPC. Steven contends that given A.W.'s relationship with his mother and DHS's abdication of its role in failing to exercise due diligence in exploring her as a placement option, it was contrary to A.W.'s best interest to terminate his parental rights. He

18

contends that this is especially so because the circuit court allowed DHS to continue to explore his mother as a placement option through the ICPC process.

We are persuaded that the circuit court clearly erred by failing to consider placement with the paternal grandmother as a less restrictive alternative to TPR. In *Clark*, *supra*, this court stated:

> The circuit court's best interest determination in this case was mistaken because it was, as we have just said, grounded in clearly erroneous factual findings. The court was clearly wrong about the grandparents not wanting to be involved in the case. The record contains ample evidence that the grandparents wanted to be involved and that their sustained effort was rebuffed by DHS. The circuit court faulted the Sargents [maternal grandparents] for not being at any of the prior hearings; the record, however, lacks any evidence that DHS notified them about any of the previous hearings. The record does show that the Sargents' consistent attempts to communicate with some Arkansas authority about the children fell into a black hole. After the children were removed from the home, DHS had a duty to try to locate grandparents and communicate with them. Ark. Code Ann. § 9-27-355(b)(1)(A)(ii)–(iii), (B)(ii)(a)–(c) (Supp. 2017). It failed to do so.

*Clark*, 2019 Ark. App. 223, at 16, 575 S.W.3d at 587–88. Here, the circuit court made no mention of Ms. Herrera's request for placement and adoption in its best-interest findings. The record is void of any attempt on the part of DHS to locate and communicate with Ms. Herrera prior to her contact with DHS in July 2019. Her contact information was lost by the caseworker, and she provided the information again one month later. However, no action was taken until early 2020, after Ms. Herrera's third attempt, when the caseworker began the ICPC process. The caseworker testified that the foster parents were not interested in adopting A.W., and she said that there had been other expressions of interest; however, there was no further testimony regarding who had expressed that interest.

The circuit court's order states that DHS "shall continue the ICPC process, but shall not make placement without a hearing."

An adopted individual becomes a stranger to his or her blood relatives, save one exception for sibling visitation. *See* Ark. Code Ann. § 9-27-341 (c)(1) (Supp. 2017); Ark. Code Ann. § 9-9-215 (Repl. 2016); *see also Suster v. Ark. Dep't of Human Servs.*, 314 Ark. 92, 97, 858 S.W.2d 122, 125 (1993) ("These statutes point to a public policy which, in determining what is in the child's best interest, favors a complete severing of the ties between a child and its biological family when he is placed for adoption."). The Sargents are not parties to this case and would not have standing to intervene as a matter of right in a subsequent adoption proceeding should the termination be affirmed. *See Suster*, *supra* (affirming denial of intervention as a matter of right where the appellant's rights as a grandparent were derivative of her daughter's parental rights and as a result were terminated when her daughter's parental rights were terminated); *Stricklin v. Ark. Dep't of Human Servs.*, 2017 Ark. App. 441, at 6, 528 S.W.3d 321, 325 ("[B]y waiting to seek intervention until after Everett's parental rights had been terminated, Stricklin lost her status as great-grandmother."). And even if the grandparents could be part of the case in its post-termination phase, no relative preference is given to grandparents over foster parents under this court's case law. *Cowan v. Ark. Dep't of Human Servs.*, 2012 Ark. App. 576, 424 S.W.3d 318. And if the children are not placed with the grandparents now, it is unlikely a court will allow them to adopt the children later.

*Clark*, 2019 Ark. App. 223, at 18–19, 575 S.W.3d at 588–89. Here, once the circuit court terminated Steven's parental rights, no relative preference can be given to Ms. Herrera.

Therefore, in light of the specific circumstances in this case, we reverse the termination of parental rights and remand for proceedings consistent with this opinion. Because we reverse on this issue, we do not address Steven's arguments regarding statutory grounds.

Reversed and remanded.

HIXSON and MURPHY, JJ., agree.

*Tabitha McNulty*, Arkansas Commission for Parent Counsel, for separate appellant Amanda Borah.

*James & Streit*, by: *Jonathan R. Streit*, for separate appellant Steven Walls.

*Andrew Firth*, Office of Chief Counsel, for appellee.

*Kimberly Boling Bibb*, attorney ad litem for minor child.