Cite as 2025 Ark. App. 324

# ARKANSAS COURT OF APPEALS

DIVISION IV
No. CV-25-38

|  |  |
|---|---|
|  | **Opinion Delivered** May 21, 2025 |
| ANGEL LEI'KEIL<br>APPELLANT | APPEAL FROM THE SEBASTIAN COUNTY CIRCUIT COURT, FORT SMITH DISTRICT |
| V. | [NO. 66FJV-22-509] |
|  | HONORABLE LEIGH ZUERKER, JUDGE |
| ARKANSAS DEPARTMENT OF HUMAN SERVICES AND MINOR CHILDREN |  |
| APPELLEES | AFFIRMED |

**KENNETH S. HIXSON, Judge**

Appellant Angel Lei'Keil appeals from the termination of her parental rights to her sons, Minor Child 1 (MC1) (DOB 04-25-13) and Minor Child 2 (MC2) (DOB 09-11-22).[1] On appeal, Angel argues that there was insufficient evidence that termination of her parental rights was in the children's best interest. We affirm.

I. *Relevant Facts and Procedural History*

On December 22, 2022, appellee Arkansas Department of Human Service (DHS) filed a petition for dependency-neglect and emergency custody of MC1 and MC2. The facts concerning the dependency-neglect were contained in an attached affidavit of a family service worker. The affidavit stated that, while Angel and the children were staying at the Women's

---

[1]The father(s) of the children were never identified in the proceedings below.

Crisis Center in Fort Smith, Arkansas, Angel had written on paper that "her children were clones, trafficked, had been kidnapped and came back as clones, calendar about mass murder, the baby turned into lead and pooped out the lead, sodomy, and her 10 year-old son that had been trafficked in the Harps parking lot and brought back as a clone, she should give the children up for adoption b/c they are the clones etc." Angel made statements that MC1 and MC2 were both killed, the children with her were their clones, and her children were sodomized and sacrificed. Angel also talked about mass killings and sacrifices of children. Angel was assessed by Western Arkansas Counseling and Guidance Center, and inpatient treatment was recommended, but Angel refused. The affidavit stated that there had been prior DHS involvement with Angel, which resulted in the oldest of her three sons being placed in the custody of her brother, Kyle Theobold. The affidavit alleged that MC1's and MC2's health and safety were in immediate danger due to Angel's mental-health issues and her unwillingness to undergo the recommended inpatient treatment.

On December 27, 2022, the trial court entered an ex parte order for emergency custody of MC1 and MC2. A probable-cause order followed on January 17, 2023.

On March 21, 2023, the trial court entered an adjudication order finding that MC1 and MC2 were dependent-neglected on the basis of parental unfitness due to Angel's mental instability that seriously impaired her ability to supervise, protect, or care for the children and due to her unwillingness to follow the direction for inpatient treatment. The trial court ordered Angel to attend counseling, undergo a drug-and-alcohol assessment and a psychological evaluation, submit to drug screening, complete parenting classes, obtain and

2

maintain stable housing and employment, maintain a valid driver's license, visit the children regularly, and keep DHS apprised of her contact information. The primary goal of the case was established as reunification.

On April 11, 2023, the trial court entered an order for expedited placement under the Interstate Compact on the Placement of Children (ICPC). In that order, the proposed placement of the children was with their maternal uncle, Kyle Theobold, who lives in Springfield, Missouri.[2]

After a review hearing held on May 18, 2023, the trial court entered a review order on June 5, 2023. In the review order, the trial court found that Angel had visited the children regularly and had completed a psychological evaluation. However, it also found that Angel had not completed parenting classes and did not have stable housing, employment, or transportation. Accordingly, the trial court found that Angel was not in compliance with the case plan. The primary goal of the case remained reunification.

A second review hearing was held on August 3, 2023, and in the review order entered August 24, the trial court noted that Angel had provided numerous addresses during the case and that it was unable to determine whether Angel had stable housing, employment, or transportation. The trial court—based on Angel's erratic behavior throughout the case—ordered her to undergo a psychiatric evaluation. The primary goal of the case was reunification with a concurrent goal of adoption following termination of parental rights.

---

[2]MC1 and MC2 were placed in Kyle's home on June 7, 2023, and they remained in his care throughout the rest of these dependency-neglect and termination proceedings.

A third review hearing was held on October 26, 2023, and the trial court entered a review order on December 11, 2023. In that order, the trial court found that although Angel had apparently completed parenting classes and a psychological evaluation, she had not completed counseling; lacked stable housing, transportation, or verifiable employment; and was not in compliance with the case plan or court orders. The trial court stated that, overall, Angel had failed to make substantial or measurable progress. The primary goal of the case was reunification with a concurrent goal of adoption following termination of parental rights.

A permanency-planning hearing was held on December 14, 2023, and in the resulting permanency-planning order entered January 19, 2024, the trial court found that Angel did not have verifiable housing or employment and that she did not have stable transportation. The trial court also found that Angel had not regularly attended counseling sessions since April 2023. The trial court found that Angel had not made significant, measurable progress on the case plan and was not in compliance with the case plan or court orders. The trial court stated that concurrent goals of the case were adoption following termination of parental rights and reunification.

After a fifteen-month review hearing held on April 11, 2024, the trial court entered a review order on May 20, 2024. In that order, the trial court noted that it had considered Kyle's Theobold's testimony at the fifteen-month review hearing at which Kyle had testified that MC1 and MC2 are healthy and thriving in his and his wife's care. Kyle had also testified that he wanted to provide permanency for the children and that he was willing to either

4

adopt the children or have guardianship of them. In the fifteen-month review order, the trial court found that Angel was not in compliance with the case plan or with the court's orders; did not have stable housing, employment, or transportation; had not visited the children regularly; had not maintained regular contact with DHS or kept DHS apprised of her residence; and had not made substantial, measurable progress toward the goal of achieving reunification. The trial court noted that, according to Angel's testimony, she was presently residing at the Dallas Life Homeless Center in Dallas, Texas. The trial court changed the primary goal of the case to adoption following termination of parental rights with a concurrent goal of reunification.

On April 16, 2024, DHS filed a petition to terminate Angel's parental rights to MC1 and MC2.[3] In its petition, DHS alleged that it was in the children's best interest for Angel's parental rights to be terminated based on the statutory grounds of failure to remedy, subsequent factors, and aggravated circumstances. *See* Ark. Code Ann. § 9-27-341(b)(3)(B)(i)*(a)*, (vii)*(a)* & (ix)*(a)(3)(A)* (Supp. 2023). The termination hearing was held on September 19, 2024.

Bridget Cornett, the DHS caseworker assigned to the case, testified at the termination hearing. Ms. Cornett stated that Angel had completed parenting classes, a drug-and-alcohol assessment, and a psychological evaluation. However, she had not completed counseling.

---

[3]The termination petition was filed after the trial court had changed the case goal at the fifteen-month review hearing but before the fifteen-month review order was formally entered. Because Angel was no longer living at the Dallas Life Homeless Center and her whereabouts were unknown, the termination petition was served on Angel by warning order.

Ms. Cornett stated that MC1 and MC2 were removed from Angel's custody due to her mental-health issues, which had remained a concern throughout the case.

According to Ms. Cornett, contact with Angel had been sporadic, and it was difficult to confirm where she was living. During the case, Angel had lived in different locations, including Dallas, Texas and Joplin, Missouri. Ms. Cornett stated that Angel had recently presented her with a copy of a lease agreement for an apartment in Joplin, but she was unsure whether Angel actually lived there or had made the necessary financial arrangements. Angel had also provided a copy of an "option agreement" that required her to make payments before moving into a house, but Ms. Cornett didn't know whether any payments had been made.

Ms. Cornett testified further that Angel's employment during the case was sporadic. Angel had different jobs but only for limited periods of time. Ms. Cornett stated that Angel had provided some paystubs to her over the past few months, the most recent of which was from Maxim Healthcare Services, which showed that Angel earned thirty dollars an hour and worked for twelve hours at that rate of pay over the course of a week. However, Ms. Cornett was concerned because this paystub was from a different employer than the previous paystub Angel had provided, and Ms. Cornett did not believe Angel had established stable employment. Ms. Cornett stated further that there was no proof that Angel had a driver's license or her own transportation. Ms. Cornett stated that throughout the case, Angel's lack of stable housing, employment, and transportation continued to be impediments to reunification.

6

Ms. Cornett also testified that Angel failed to complete a substantial number of scheduled visits with the children. Most of these scheduled visits were Zoom meetings with the children, who had been placed with Angel's brother, Kyle. Ms. Cornett stated that out of eighty scheduled visits, Angel completed only twenty-eight. While acknowledging that a few of these visits had been canceled by DHS and some by Kyle, there were thirty-four "no shows" in which Angel failed to appear at all.

Ms. Cornett testified that although DHS had provided services and made meaningful efforts to help Angel stabilize her situation and correct the conditions that caused removal of the children, Angel's mental health had not significantly improved, and there had been no meaningful progress toward reunification. Ms. Cornett did not believe there was a reasonable likelihood that continued DHS services would help Angel reach that goal, and she thought that placing the children back in Angel's custody would be potentially harmful to the children's health, safety, and well-being.

Ms. Cornett stated that MC1 and MC2 are "very sweet, bright, loving, and caring children," and they are both "very adoptable." She stated that MC1 and MC2 were living with Angel's brother, Kyle, who also had a guardianship of the children's older brother from a prior dependency-neglect case involving Angel. Ms. Cornett stated that Kyle was interested in adopting MC1 and MC2. Ms. Cornett stated further that, regardless of adoptability, she thought termination of parental rights was in MC1 and MC2's best interest due to Angel's mental-health issues and lack of stability.

On cross-examination, Ms. Cornett was asked about DHS's policy on a possible guardianship versus adoption and why a guardianship with Kyle would not be effective for creating permanency for MC1 and MC2. Ms. Cornett stated that DHS was not considering a guardianship as an alternative to adoption due to Angel's lack of consistency throughout the case and the fact that Kyle had stated he was interested in adoption and would not be open to a guardianship.

Angel testified that she is currently living with a friend, Michael Hughes, in Joplin, and she does not pay rent or utilities. She stated that the lease on her apartment was to start the following day. She also stated that she had made one payment on the option agreement on the house and would have to pay $6400 more before she could move in. Angel stated that her friend was letting her live with him free of charge so she could save money toward the down payment on the house.

Angel stated that she is an LPN and started working for Maxim Health Care doing home-health services a few months ago. Angel stated that this was initially a part-time job but that at the end of last week, it became a full-time job. Therefore, she had not yet received a paycheck reflecting full-time hours. Angel stated that she does not own a car but uses Uber or Lyft, which she thought was reliable transportation. Angel took a bus from Joplin to attend the termination hearing.

Angel testified that, since the case was opened, she has had three in-person visits with the children. She also stated that for almost a year she had no visits at all, which she said

was DHS's fault.  With respect to the Zoom visits, Angel disputed the number of "no shows" reported by DHS and stated that some of her missed visits were due to scheduling issues.

Angel stated that she was attending counseling.  She also stated that she does not have a mental-health diagnosis.  Angel believed that she met the requirements necessary to achieve reunification with MC1 and MC2.  Angel stated further that, if her sons were not returned to her, she wished for her brother to have a guardianship rather than termination of her parental rights and adoption.

The trial court questioned Angel about a text exchange between Angel and a DHS employee concerning her visitation.  In this text exchange, Angel, made unsolicited random statements about the Holocaust, Vikings, the Biden Presidency, an alien invasion, a chainsaw massacre, human trafficking, the Trail of Tears, and New World Order.

A CASA report, which was prepared ten days before the termination hearing, was also introduced into evidence.  The report stated that the CASA worker had had no recent contact with Angel because her location was unknown.  The report stated further that MC1 and MC2 continued to thrive in their uncle's home.  The CASA report expressed concern about Angel's mental health and stability, and it recommended termination of Angel's parental rights with the goal of adoption.

On October 23, 2024, the trial court entered an order terminating Angel's parental rights to MC1 and MC2.  The trial court found by clear and convincing evidence that all three statutory grounds alleged in DHS's petition supported termination.  Pursuant to Ark. Code Ann. § 9-27-341(b)(3)(B)(i)(*a*), the trial court found that the children had been

adjudicated dependent-neglected and had continued to be out of Angel's custody for twelve months and, despite a meaningful effort by DHS to rehabilitate Angel and correct the conditions that caused removal, those conditions had not been remedied by Angel. Pursuant to subdivision (b)(3)(B)(vii)*(a)*, the trial court found that other factors or issues arose subsequent to the filing of the original petition for dependency-neglect that demonstrate that placement of the children in Angel's custody is contrary to their health, safety, or welfare, and that, despite the offer of appropriate family services, Angel has manifested the incapacity or indifference to remedy the subsequent issues or factors or rehabilitate her circumstances that prevent the placement of the children in Angel's custody. Finally, under subdivision (b)(3)(B)(ix)*(a)(3)*, the trial court found that Angel had subjected the children to aggravated circumstances, meaning that there is little likelihood that services to the family will result in successful reunification. The trial court specifically found that Angel had not substantially complied with the case plan or court orders; had not demonstrated meaningful progress; had failed to obtain and maintain stable housing, employment, and transportation; and had failed to regularly visit the children. The trial court found further that Angel's testimony cannot be relied upon because it continually shifted and was not credible.

The trial court also found by clear and convincing evidence that termination of parental rights was in MC1 and MC2's best interest, and the court considered the likelihood that the children would be adopted as well as the potential harm of returning them to Angel's custody as required by Arkansas Code Annotated section 9-27-341(b)(3)(A)(i) & (ii). The trial court specifically found:

10

As to the juveniles' adoptability, the Court finds that they are adoptable because they are young children and have no extreme medical or behavioral issues. And the Court also notes that the uncle (Angel's brother), with whom the children are placed, has indicated to the Department a preference to adopt them. Regardless of adoptability, though, the court finds that it is in the best interest of the juveniles for the rights of the parent to be terminated.

As to potential harm, the Court finds that the juveniles would be subjected to substantial risk of harm if they were returned to the parent. That includes the threat of harm to the juveniles' health and safety due to the parent's lack of suitable lifestyle; the parent's history of mental illness or instability; the parent's lack of stability due to her lack of stable housing, income/employment and transportation; the parent's failure to meaningfully comply with case plan reunification services; the parent's failure to remedy the problems which caused removal; and the fact that the juveniles have been doing well in foster care, which status would likely be disrupted by a return to the parent. Further, the parent has failed to show that she can meet the juveniles' basic needs, despite having ample opportunity over the course of more than a year to change her behavior and to remedy her underlying problems.

This appeal followed.

## II. *Standard of Review*

A trial court's order terminating parental rights must be based on findings proved by clear and convincing evidence. Ark. Code Ann. § 9-27-341(b)(3). Clear and convincing evidence is defined as that degree of proof that will produce in the fact-finder a firm conviction as to the allegation sought to be established. *Posey v. Ark. Dep't of Health & Hum. Servs.*, 370 Ark. 500, 262 S.W.3d 159 (2007). On appeal, the appellate court reviews termination-of-parental-rights cases de novo but will not reverse the trial court's ruling unless its findings are clearly erroneous. *Id.* A finding is clearly erroneous when, although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been made. *Id.* In determining whether a finding is

11

clearly erroneous, an appellate court gives due deference to the opportunity of the trial court to judge the credibility of witnesses. *Id.*

In order to terminate parental rights, a trial court must find by clear and convincing evidence that termination is in the best interest of the juvenile, taking into consideration (1) the likelihood that the juvenile will be adopted if the termination petition is granted; and (2) the potential harm, specifically addressing the effect on the health and safety of the child, caused by returning the child to the custody of the parent. Ark. Code Ann. § 9-27-341(b)(3)(A)(i) & (ii). The order terminating parental rights must also be based on a showing of clear and convincing evidence as to one or more of the grounds for termination listed in section 9-27-341(b)(3)(B). However, only one ground must be proved to support termination. *Reid v. Ark. Dep't of Hum. Servs.*, 2011 Ark. 187, 380 S.W.3d 918.

The intent behind the termination-of-parental rights statute is to provide permanency in a child's life when it is not possible to return the child to the family home because it is contrary to the child's health, safety, or welfare, and a return to the family home cannot be accomplished in a reasonable period of time as viewed from the child's perspective. Ark. Code Ann. § 9-27-341(a)(3). Even full compliance with the case plan is not determinative; the issue is whether the parent has become a stable, safe parent able to care for his or her child. *Cobb v. Ark. Dep't of Hum. Servs.*, 2017 Ark. App. 85, 512 S.W.3d 694. Moreover, a child's need for permanency and stability may override a parent's request for additional time to improve the parent's circumstances. *Id.* Finally, a parent's past behavior is often a good indicator of future behavior. *Id.*

### III. *Best Interest*

On appeal, Angel does not challenge the trial court's findings as to the statutory grounds supporting termination. Angel instead argues that there was insufficient evidence that termination was in MC1's or MC2's best interest. Angel specifically argues that MC1 and MC2 had the ability to achieve permanency through a less restrictive alternative of a guardianship with a relative, the children's uncle Kyle, with whom they had been placed long before termination.

Arkansas Code Annotated section 9-27-329(d) (Repl. 2020), provides, "In initially considering the disposition alternatives and at any subsequent hearing, the court shall give preference to the least restrictive disposition consistent with the best interests and welfare of the juvenile and the public." The least-restrictive alternative is a relevant inquiry at the termination-of-parental rights hearing. *Lively v. Ark. Dep't of Hum. Servs.*, 2015 Ark. App. 313, 456 S.W.3d 383.

Angel asserts that because MC1 and MC2 were already in Kyle's care, termination was not necessary to achieve permanency, which instead could have been achieved through a guardianship that would have maintained the status quo. Angel contends that she was making progress in the case, had demonstrated stability, and is strongly bonded with the children. She therefore argues that termination of her parental rights was not in the children's best interest and that trial court should have chosen the less restrictive alternative of a relative guardianship.

13

In support of her argument, Angel cites *Borah v. Arkansas Department of Human Services*, 2020 Ark. App. 491, 612 S.W.3d 749. In *Borah*, we reversed and remanded a termination decision because the trial court had failed to consider placement with the child's grandmother as a less restrictive alternative to termination. In that case, the child and the grandmother were bonded, and although the child had not been placed with the grandmother, there had been repeated requests for placement by the parents and the grandmother. In reversing the termination in *Borah*, we noted that DHS had failed to communicate with the grandmother and that the trial court made no mention of the grandmother's request for placement and adoption in its best-interest findings. We stated that "in light of the particular circumstances in this case, we reverse the termination of parental rights and remand for proceedings consistent with this opinion." *Borah*, 2020 Ark. App. 491, at 21, 612 S.W.3d at 761.

We conclude that our decision in *Borah* does not compel reversal of the termination decision here. In this case, MC1 and MC2 had been in their uncle's placement during most of these dependency-neglect proceedings, and in the termination order, the trial court specifically addressed the children's placement with Kyle and found that he had indicated to DHS a preference to adopt the children (as opposed to a guardianship).

Furthermore, under the circumstances of this case, we hold that the trial court did not clearly err in finding that termination of parental rights, rather than a guardianship, was in the children's best interest. In *Anderson v. Arkansas Department of Human Services*, 2023 Ark. App. 18, 658 S.W.3d 470, we stated that when the parent demonstrates stability and a

14

reasonable hope for reunification, then there is no harm in waiting a little longer before terminating parental rights; but when that stability and a reasonable hope for reunification are not present, there is no reason to further delay permanency through termination and adoption. In *Moore v. Arkansas Department of Human Services*, 2024 Ark. App. 4, 682 S.W.3d 706, we held that because there was no reasonable expectation that the child would be able to reunify with the parent, the trial court did not clearly err in choosing termination over a guardianship.

This case began as a result of Angel's mental-health issues and her written statements that MC1 and MC2 had been sodomized, sacrificed, and cloned and that she should give them up for adoption. Despite recommended inpatient treatment, Angel refused the treatment, and there was no evidence that her mental-health issues had been addressed as of the date of the termination hearing. The record also shows that, almost two years into this dependency-neglect case, Angel had not established stable housing, employment, or transportation, and she was not in compliance with the case plan. Angel frequently changed addresses and was often out of contact with DHS. And despite Angel's claim that she is bonded with the children, the record shows that she had failed to regularly attend her visitation with the children. There was no compelling reason for the trial court to choose a guardianship rather than termination of parental rights and adoption because there was no reasonable prospect that Angel would eventually reunify with MC1 or MC2 as demonstrated by her failure to challenge the statutory grounds that support the termination. *See Price v. Ark. Dep't of Hum. Servs.*, 2023 Ark. App. 140.

IV. *Conclusion*

On the record presented, we hold that the trial court did not clearly err in finding that termination of Angel's parental rights was in MC1 and MC2's best interest. Accordingly, we affirm the order terminating Angel's parental rights to both children.

Affirmed.

ABRAMSON and THYER, JJ., agree.

*Jennifer Oyler Olson*, Arkansas Commission for Parent Counsel, for appellant.

*Ellen K. Howard*, Ark. Dep't of Human Services, Office of Chief Counsel, for appellee.

*Dana McClain*, attorney ad litem for minor children.